IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KLEIN-BECKER USA, LLC, a Utah Limited Liability Company and KLEIN-BECKER IP HOLDINGS, LLC, a Nevada Limited Liability Company, | |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| PATRICK ENGLERT, individually and d/b/a Mr. Finest Supplements, strivectin-sales, skin-cream-sales, strivectinsales@aol.com, MrFinest.com, MrFinestSupplements.com; TOM ENGLERT individually and d/b/a Mr. Finest Supplements, strivectin-sales, skin-cream-sales, strivectinsales@aol.com, MrFinest.com, MrFinestSupplements.com; Mr. Finest Supplements, Inc., | Case No. 2:06-CV-378 TS |
| Defendants. | |

## I. BACKGROUND

Plaintiff Klein-Becker USA, LLC and Klein-Becker IP Holdings, LLC (collectively Klein-Becker or Plaintiff) brought this case seeking injunctive relief and damages on claims for trademark infringement, false advertising under the Lanham Act, and other claims arising from Defendants' Internet sales of products bearing it trademarks StriVectin–SD®, and StriVectin–SD® Eye Cream (collectively "StriVectin–SD®" products).

Throughout this case, the willful misconduct of the Defendants Patrick Englert and Mr. Finest Supplements, Inc. (Mr. Finest)[1] has resulted in sanctions. On June 20, 2007, the Court awarded attorney fees and costs as a sanction against the Englert Defendants for their conduct in, among other things, withholding information and intentionally causing delay and failing to comply with discovery deadlines.[2] On January 23, 2008, the amount of those sanctions were determined to be $75,411.45 and the Court ordered the Englert Defendants to pay the amount no later than February 29, 2008.[3]

On March 27, 2008, Klein-Becker's third motion for sanctions was granted and judgment was entered in favor of Klein-Becker and against the Englert Defendants on Klein-Becker's claims of copyright infringement, false advertising (Lanham Act), unfair competition (Lanham Act), false advertising (Utah Truth in Advertising Act), unfair competition (Utah Unfair Practices Act); intentional interference with existing and

---

[1]Defendants Englert and Mr. Finest will be collectively referred to as the Englert Defendants or Englert.

[2]Docket No. 179.

[3]Docket No. 221. The Englert Defendants' liability for the sanctions are joint and several.

prospective business relations; fraud, and civil conspiracy.[4]   Because partial summary judgment was also entered against the Englert Defendants and in favor of Klein-Becker on the merits of the trademark infringement claims,[5] there were only two main issues remaining for trial.  First, the amount of damages on Klein-Becker's claims.  Second, pursuant to a March 26, 2008 Order,[6] the issue of payments claimed by the Englert Defendants for product seized from him or obtained by him directly from Klein-Becker.  Set separately to follow trial was the Order to Show Cause why Klein-Becker should not be held in contempt for the failure to pay the earlier $75,411.45 sanction.

The Court held a bench trial.  Thereafter, the parties submitted their proposed findings and conclusions.   The Court makes its findings and conclusions herein.

The Court finds damages in the total amount of $773,386.31.   The Court also finds that this is an exceptional case under the Lanham Act and awards Klein-Becker attorney fees and costs. The Court finds that the Englert Defendants have conceded their claim against the bond for any product seized by or purchased from Klein-Becker by their failure to present evidence at trial.

## II.  FINDINGS OF FACT

Many of the facts are undisputed pursuant to the Pretrial Order.[7]

---

[4]Docket No. 228.

[5]Docket No. 227.

[6]Docket No. 225.

[7]Docket No. 296 (Sealed Pretrial Order).

## A.     THE STRIVECTIN PRODUCTS, TRADEMARKS, AND COPYRIGHT

1.     At all times relevant to this proceeding, Klein-Becker conceived of, developed and produced proprietary topical cosmetic products, including StriVectin–SD® and StriVectin–SD® Eye Cream (collectively "StriVectin– SD®" products), that it distributed and marketed under its own trade names and trademarks.[8] Each Klein-Becker product was packaged in trademarked, copyrighted packaging that bears Klein-Becker's unique and distinctive trade dress.

2.     The StriVectin–SD® trademark was adopted for use in interstate commerce in August 2002 and it was registered in the United States Patent and Trademark Office on September 2, 2003, as Registration No. 2,760,414. The registration is valid and has not been revoked or canceled. At all times relevant to this proceeding, Klein-Becker was the exclusive licensee of the StriVectin–SD® trademark from Klein-Becker I.P. Holdings, LLC. StriVectin™ is an arbitrary word chosen by Klein-Becker as its trademark due to its uniqueness. Klein-Becker's trade dress either has acquired a secondary meaning to the consumers or is so distinctive in nature that no secondary meaning is required. At all times relevant to this proceeding, Klein-Becker was the current, active, and exclusive licensee of all StriVectin–SD® trademarks, trade dress, and copyrights.

_____

[8]After the trial of this matter, the StriVectin-related assets were sold to a third-party. Because the events and injuries relevant to this lawsuit occurred before that transaction, and because the named Plaintiffs retain all interest in the proceeds of this lawsuit, Plaintiffs remain the real parties in interest. These Proposed Findings of Fact and Conclusions of Law reflect the change in ownership by limiting certain statements of fact temporally to "all times relevant to this proceeding."

4

3.     Klein-Becker has expended a great deal of time, effort, and money developing its intellectual property rights in connection with StriVectin–SD®, including the trademark, packaging trade dress, copyrighted label, copyrighted package insert, and copyrighted advertisements that have appeared in numerous newspapers and magazines, as well as on Klein-Becker's Web sites (*e.g.*, www.strivectin.com and http://www.kleinbecker.com).

4.     At all times relevant to this proceeding, Klein-Becker maintained rigorous quality control over the manufacture and distribution of its StriVectin–SD® products.  In order to maintain this superior quality control for its StriVectin–SD® products and to protect its reputation for high-quality and goodwill in the industry and with the consuming public, Klein-Becker developed and maintained an exclusive and selective network of authorized manufacturers and distributors.

5.     At all times relevant to this proceeding, Klein-Becker contracted with a select number of manufacturers to produce its StriVectin–SD® products ("Authorized Product Manufacturers").  Klein-Becker controlled the amounts of each trademarked product for distribution through its Authorized Product Manufacturers.  Klein-Becker prohibited by agreement, trademark laws, or other federal and/or state laws, any unauthorized production, distribution or sale of product by Authorized Product Manufacturers.  Authorized Product Manufacturers agree not to disclose the formulations used to make the StriVectin™ brand products.  Authorized Product Manufacturers are prohibited from selling products that contain any StriVectin™ trademarks or copyrighted material to anyone other than Klein-Becker.

6.      Klein-Becker utilized a number of authorized resellers (the "Reseller" or "Resellers") to distribute its products.  Resellers are selected based on their reputation and their proven ability to service customers.  Authorized Resellers are trained in and agree to meet Klein-Becker's quality control standards for storing and selling StriVectin–SD® products and for providing before and after sales support by personnel trained to assist customers to maximize the benefit of Klein-Becker products.

7.      Klein-Becker and its Resellers entered into reseller purchase agreements that restrict resale on the Internet or in e-commerce without Klein-Becker's express written authorization, and restrict sales by Resellers to only individual customers, as end-users.  Thus, without specific authorization from Klein-Becker, no Reseller is authorized to sell any Klein-Becker trademarked products to intermediaries or unauthorized resellers.

8.      Resellers also agreed not to and are prohibited from copying, reproducing, or otherwise replicating any of Klein-Becker's trademarks, copyrighted materials, trade dress, marketing materials, or advertising materials without Klein-Becker's express permission.

9.      Klein-Becker established its exclusive manufacturers and distribution system for five important and legitimate business reasons: protecting the validity of its trademarks; maintaining assurance of sales support; maintaining assurance of quality control; avoiding illegitimate refunds; and avoiding product liability claims.

10.      Through the efforts of Klein-Becker, its Authorized Product Manufacturers, and its Resellers, Klein-Becker products have developed a reputation of

high quality and goodwill in the industry and the consuming public.  Klein-Becker's high quality control standards are an integral part of the StriVectin–SD® line of products identified by the StriVectin™ brand name.  Indeed, the StriVectin™ brand name symbolizes high quality in the eyes of the consuming public and industry.  In order to maintain the reputation and genuineness of the StriVectin–SD® line of products, the quality standards must be controlled by Klein-Becker.

11.     StriVectin has been a successful product.  In 2006, for example, StriVectin was the number 4 cosmetic SKU in the United States.

12.     Through its exclusive manufacturing and distribution network, Klein-Becker ensures that its quality control standards are maintained, so that inferior products that bear the StriVectin™ brand name, adulterated products, and counterfeit products are not sold to consumers.  Moreover, Klein-Becker provides a money-back guarantee for every product.  Customers that purchase potentially adulterated, damaged, degraded, out-of-date, or counterfeit StriVectin™ branded products could return such products to an authorized Reseller or to Klein-Becker and expect a full refund from Klein-Becker.

B.     THE ENGLERT DEFENDANTS' UNAUTHORIZED SALES OF STRIVECTIN PRODUCTS

13.     Defendant Patrick Englert is the President of Defendant Mr. Finest Supplements, Inc., and he is the only officer or director of Mr. Finest.  Patrick Englert owns and controls the website www.mrfinest.com.

14.     The Englert Defendants have used at least the following email addresses in conducting business:

7

- Skincreamsales@aol.com

- StriVectinsales@aol.com

- Morethanvitamins@aol.com

- Enzytesales@aol.com

- Payment@mrfinest.com

- Skincarestuff@aol.com

- Patrickenglert@aol.com

- Toppsfraud@aol.com

- Weightlossstuff@aol.com

- Payments@mrfinest.com

- Finestref@aol.com

- Djtrouble9@aol.com

- Mrfinest@mrfinest.com

- Ascenteddiscount@aol.com

15.    The Englert Defendants have used at least the following eBay identifiers to sell StriVectin products:

- Movieexchange

- Online Liquidators

- Skin-Cream-Sales

- StriVectin Sales

- Tim Pone 90

- A Scented Discount

16.     The Englert Defendants are not authorized Resellers or Authorized Product Manufacturers of Klein-Becker's StriVectin–SD® products. Klein-Becker has never authorized any company or individual to resell StriVectin–SD® products to any of the Englert Defendants for subsequent resale. Plaintiffs have not consented to the use of their StriVectin–SD® trademark by the Englert Defendants.

17.     The Englert Defendants admit that they are not authorized resellers of Klein-Becker's StriVectin–SD® products. The Englert Defendants admit that they are not Authorized Product Manufacturers of Klein-Becker's StriVectin–SD® products.

18.     Despite the fact that none of the companies or d/b/a's used by the Englert Defendants are authorized Resellers or Product Manufacturers of StriVectin–SD® products and without the authorization or prior knowledge of Klein-Becker, the Englert Defendants have advertised and sold products marketed as StriVectin–SD® products. The Englert Defendants have sold StriVectin–SD® products directly, via eBay under user identification names "strivectin-sales" and "skin-cream-sales", and via their commercial web portals of "mrfinestsupplements.com" and "mrfinest.com."

19.     The Englert Defendants' unauthorized sales of Klein-Becker's products on the Internet undermine the brand integrity, brand reputation and the goodwill associated with StriVectin–SD®.

20.     Klein-Becker has established criteria for Internet retailers, including: quality; look and feel of the retailer's website; the volume of traffic to the retailer's website; the quality of the competitive product offerings on the retailer's website; the willingness and commitment of the retailer to showcase, promote and advertise StriVectin–SD® products

and other Klein-Becker products; the retailer's commitment to Basic Research's authorized reseller policies; and the retailer's customer service policies.

21.     The Englert Defendants' websites do not satisfy these requirements, and their sale of Klein-Becker's products undermines the reputation and goodwill of the StriVectin® brand.

22.     These sales also damage Klein-Becker's relationships with authorized resellers, as well as their competitiveness in the cosmetics industry.

23.     The Englert Defendants' gross sales of StriVectin-SD products were at least $673,988.17.

24.     The $673,988.17 sales figure is derived from business records received from PayPal reflecting $169,739.27 in sales from Mr. Finest and $504,248.90 in sales from StriVectinSales.com and SkinCreamSales.com.   The total of these sales is $673,988.17.

25.     The Englert Defendants acknowledge they received payments for StriVectin products by PayPal, check, money order, and cash.  Thus, the PayPal records alone do not capture all of the Englert Defendants' StriVectin sales.

26.     There is an insufficient record to determine if the $400,186.69 from total sales documents seized from the Englert Defendants are already included in the $673,988.17 figure.   Therefore, the $400,186.69 figure will not be added to the $673,988.17 figure.  Instead, the Court finds that the total sales are at least $673,988.17 and are likely much higher.

27.     The Englert Defendants offered no testimony or evidence at trial concerning its gross or net sales of StriVectin-SD® products.   Nor did the Englert Defendants offer any testimony or evidence establishing any offsets that it claims should be taken from the gross sales figure to yield a net profit calculation.

C.     THE ENGLERT DEFENDANTS' PARTICIPATION IN THE GNC FRAUD

28.     General Nutrition Center ("GNC") stores are entitled to special pricing from Klein-Becker.  Englert posed as GNC stores by fraudulently altering the "Bill To" and "Ship To" address on their invoices.

29.     The Englert Defendants were in possession of dozens of invoices and packing slips listing GNC accounts, and even listing GNC stores as the name on the account.  Englert were not authorized to receive products in this fashion.

30.     The Englert Defendants knew they were illicitly acquiring StriVectin-SD® products through such diversions.  The Englert Defendants admitted as much when they attempted to extort an authorized exclusive distributorship from Klein-Becker in or about April 2006.

31.     Klein-Becker suffered actual damages from this GNC scheme in an amount no less than $78,056.14.   These damages are measured by calculating the difference between the discounted price the Englert Defendants actually paid for the product they purchased through the GNC scheme and the price at which they were entitled to purchase such product.  Because the $78,056.14 already has been deducted from the amount the Englert Defendants actually paid for the product, it will be added to the general damages figure as fraud damages below.

D.   THE ENGLERT DEFENDANTS' PURCHASE, SALE, AND POSSESSION OF STOLEN STRIVECTIN PRODUCTS.

32.   On January 3, 2007, thieves broke into the Salt Lake City warehouse of Basic Research, LLC, the exclusive distributor of Klein-Becker's products, stealing StriVectin–SD® products worth $320,000.00 at retail prices.  All products that were stolen were marked with one of two unique lot numbers that have never been legitimately or legally sold or distributed.

33.   Immediately following the robbery, Klein-Becker took great care to quarantine and secure the remaining products with those unique lot numbers in their warehouse.  Thus, all products with these two lot numbers that appear in the marketplace are stolen merchandise.

34.   On February 28, 2007, the Court granted Klein-Becker's Ex Parte Emergency Motion for a Temporary Restraining Order ("TRO") and Seizure Order.  The TRO and Seizure Order was amended twice on March 1, 2007.[9]

35.   When Klein-Becker carried out the Court's Seizure Order on March 1, 2007, they found 269 tubes of their stolen product with a retail value of more than $36,000.00 at Defendant Patrick Englert's residence, which is also where he conducts much of the business activity of the Englert Defendants.   Klein-Becker also seized numerous empty cardboard boxes marked with the stolen lot number.  These cardboard

_____

[9]Those Orders remain sealed.

12

boxes were among those stolen from Klein-Becker's warehouse and would have contained at least another 84 tubes of stolen product.

36.     Klein-Becker was also able to purchase, via eBay, 16 additional units of the stolen product (bearing one of the two unique lot numbers) from Englert.

37.     Englert purchased $316,032.21 of StriVectin-SD® product from either of two individuals with the last name of Romero.  All StriVectin-SD products that the Romeros sold to Englert were stolen.

38.     Stolen StriVectin product—even if it is recovered—must ultimately be destroyed because the product was out of Klein-Becker's control.

39.     Klein-Becker's damages from Englert's possession and sale of stolen StriVectin-SD® product are at least $49,500, calculated as follows: $36,000 in stolen product seized from Patrick Englert's residence, $11,340 in stolen product missing from boxes found in the Englert Defendants' possession (84 units at $135 retail value each), and $2,160 in stolen product that Klein-Becker was able to purchase on eBay (16 units at $135 retail value each).

40.     Klein-Becker's damages from the Englert Defendants' purchase of stolen StriVectin-SD® products is at least $316,032.21—the total value of stolen StriVectin-SD® products Englert purchased from the Romeros.  As it can be assumed that Englert paid less than the full retail—or even wholesale—price for the stolen product, Klein-Becker's actual damages relating to the stolen product are almost certainly much higher than $ 49,500.

41. However, it appears much of this amount of damages for the stolen property are already accounted for in the Lanham Act damages figure based on total sales of the StriVectin-SD® product on eBay. The amount not accounted for is the $11,340 in stolen property that was recovered from Defendant's property and that must ultimately be destroyed because it was out of Klein-Becker's control.

E. EVIDENCE THAT THE ENGLERT DEFENDANTS ACTED WILLFULLY

42. Documents obtained by Klein-Becker pursuant to the Court's Seizure Order on March 1, 2007, demonstrate that the Englert Defendants are a large-volume unauthorized reseller of Klein-Becker's products.

43. Such documents also demonstrate that the Englert Defendants have purchased and sold StriVectin–SD® well below what they knew to be its actual wholesale price from Klein-Becker.

44. During the seizure, Klein-Becker also found tubes of StriVectin–SD® with no lot number printed anywhere on the packaging. Klein-Becker was able to purchase from the Englert Defendants, via eBay, 4 additional units of StriVectin–SD® with no lot number printed anywhere on the packaging.

45. Where a StriVectin–SD® product package does not have a lot number printed on the package, the product is likely either counterfeit or stolen from the manufacturer prior to the manufacturer printing the lot number on the product package.

46. The Englert Defendants' actions demonstrate that they were on notice that they illegally or illicitly purchased StriVectin–SD® for resale. For example, when Defendant Patrick Englert discovered a source of StriVectin–SD® who claimed to have paid

$55.00 for the product, he immediately offered to purchase 1,000 tubes for $60.00 each.

47. Klein-Becker alleged in the Second Amended Complaint that, "[a]t all times" Patrick Englert and the other Englert Defendants "acted knowingly, intentionally, willfully and wantonly contrary to law."[10] This allegation, like all factual allegations in the Second Amended Complaint, has been deemed admitted.

F. THE ENGLERT DEFENDANTS' INTERFERENCE WITH ECONOMIC RELATIONS

48. During discovery the Englert Defendants produced numerous invoices reflecting that they received StriVectin–SD® from Iowa Nutrition, an authorized Basic Research customer. Each of these invoices is accompanied by a copy of a Purchase Agreement, which explicitly states:

> RESALE. Purchaser is not authorized to sell any product via the Internet or in e-commerce or to other resellers, Internet sites, or auctions without express written authorization. . . . Purchaser may only sell products to end users within the United States of America . . . unless . . . given other express written authorization.

Thus, as a reseller on the Internet, including eBay, the Englert Defendants were on notice that their receipt of product from Iowa Nutrition or any other authorized Reseller was not authorized by Klein-Becker and would be a breach of the reseller policy by an authorized reseller. The Englert Defendants induced authorized resellers such as Iowa Nutrition to breach this reseller policy.

---

[10]Docket No. 212 at ¶ 52.

49.     Defendant Patrick Englert, the President and owner of Mr. Finest, had a copy of Klein-Becker's reseller policy on his desk when the Seizure Order was served and several other copies were found at the business.

G.     THE ENGLERT DEFENDANTS' OBSTRUCTION OF DISCOVERY EFFORTS

50.     On February 9, 2007, Klein-Becker moved this Court to sanction the Englert Defendants for delaying and obstructing the Court-ordered expedited discovery in advance of the preliminary injunction hearing.  In the alternative, Klein-Becker moved to compel discovery from the Englert Defendants.

51.     In a February 28, 2007, Memorandum Decision on the Motion to Compel, the Magistrate Judge held:

> Based upon the Court's review of the Defendants' written responses, the majority are inadequate to the point that the Court finds them almost contemptuous of and obstructive to the judicial process and schedule in this case, particularly in light of the many orders that have been entered in this case and the great need for the information for a productive hearing on Plaintiffs' Motion for Preliminary Injunction.
>
> . . . .This failure by Defendants serves to obscure the subject of discovery.[11]

52.     On March 21, 2007, shortly before the preliminary injunction hearing and upon discovering that Defendants had withheld information they should have disclosed previously in the discovery process, Klein-Becker renewed its Motion for Sanctions.

---

[11]Docket No. 115 at 4-5.

53.     On June 20, 2007, the Magistrate Judge issued a Memorandum Decision and Order Granting in Part Renewed Motion for Sanctions and Motion for Sanctions holding:

> Following the entry of the expedited discovery order, the Defendants began a pattern of evasive and dilatory behavior. . . . . The contemptuous nature of the needless delay caused by defendants is evidenced by the recently discovered fact that defendants had prepared written responses to the interrogatories that were signed and notarized on December 5, 2006. These responses contained information about Defendants' product sources that was critical to further discovery and to a meaningful Preliminary Injunction hearing. The December 5 responses were seized at Defendants' place of business in St. Louis, Missouri on March 1, 2007 pursuant to the court's Temporary Restraining Order, Seizure Order, and Order to Seal File Temporarily and the Memorandum Decision and Order Granting Motion to Compel.
> . . . .
>
> . . . The first written discovery responses were delivered over four months after the deadline set in the order "expediting" discovery. Plaintiffs thus had very little time to prepare for the Preliminary Injunction hearing scheduled for March 22, 2007. By not providing Plaintiffs with information regarding product source in a timely fashion, Defendants obstructed the judicial process.
>
> Plaintiffs were further prejudiced by the Defendants' failure to provide electronic data and a privilege log and by Defendants' concealment of 250 to 350 units of StriVectin–SD® during the March 1 Rule 34 Inspection. . . .
> . . . .
>
> Defendants' failure to disclose the existence of 250 to 350 units of StriVectin–SD® during the court ordered March 1 Inspection was also prejudicial to the judicial process. . . .
>
> The Defendants have been slow in fulfilling their discovery obligations and complying with court orders. . . . .
> . . . .
>
> The Plaintiffs have been prejudiced in several significant ways by Defendants' discovery behavior. The delay in providing information about product sources prevented Plaintiffs from fully presenting their case at the

Preliminary Injunction hearing and made it difficult to adequately prepare for depositions. Defendants' failure to provide any electronic data also prejudiced defendants. . . .

. . . .

. . . Plaintiffs obtained the result they desired from the hearing even if they did not have all the information they needed to prepare for it. However, this is a retrospective view. Defendants' behavior would have thwarted Plaintiff's efforts had Plaintiffs not taken other measures, such as obtaining the seizure order.

. . . .

This court has already found that the Defendants' behavior has interfered with the judicial process when it stated that the "repeated failures to comply with the orders of the court and discovery obligations have severely prejudiced the attempts by the magistrate judge to manage this case." The Defendants have greatly interfered with the judicial process by filing repeated motions for protective orders and then not taking advantage of the protection given, thus delaying discovery and causing confusion. . . . Defendants did not meet *any* of those deadlines. Defendants disrupted the sequence of discovery by not adequately responding to interrogatories in a timely fashion and not providing documents or electronic data thus forcing Plaintiffs to seize the material. Defendants have made a mockery of the time frame that was set for this case.

. . . .

Defendants have deliberately withheld information and intentionally caused delay. . . .

. . . . Defendants have purposefully inhibited the progress of this case.[12]


### III.    CONCLUSIONS OF LAW

1.    JURISDICTION.

A.    This is an action for (a) trademark infringement under the Lanham Act, (b)

copyright infringement under the Lanham Act, (c) false advertising under the Lanham Act,

(d) unfair competition under the Lanham Act, (e) false advertising in violation of the Utah

---

[12]Docket No. 179 at 2-7 (emphasis in original).

Truth in Advertising Act, (f) unfair competition in violation of the Utah Unfair Practices Act, (g) intentional interference with existing and prospective business relations, (h) fraud, and (i) civil conspiracy.

B.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367, and under 15 U.S.C. § 1121.

2.  VENUE.

A.  Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c).  Venue is laid in the Central Division of the District of Utah.  28 U.S.C. § 125.[13]

3.  LIABILITY.

A.  By virtue of the Court's entry of summary judgment and the Court's imposition of terminating sanctions, the Court had concluded, prior to trial, that Defendants Englert and Mr. Finest are both liable under each of Plaintiffs' causes of action: (a) trademark infringement under the Lanham Act, (b) copyright infringement under the Lanham Act, (c) false advertising under the Lanham Act, (d) unfair competition under the Lanham Act, (e) false advertising in violation of the Utah Truth in Advertising Act, (f) unfair competition in violation of the Utah Unfair Practices Act, (g) intentional interference with existing and prospective business relations, (h) fraud, and (i) civil conspiracy.

---

[13]Docket No. 220 (finding Defendants' Motion to Change Venue to be untimely).

4.    LANHAM ACT DAMAGES

A.    Remedies available under the Lanham Act for infringement of a registered trademark include "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).

B.    Klein-Becker does not seek actual damages under the Lanham Act.  Instead, the primary remedy Klein-Becker seeks is disgorgement of the Englert Defendants' profits from their sales of Klein-Becker' products.  Defendants counter that an award of profits under the Lanham Act is inappropriate because Plaintiff did not show actual damages, that the Englert Defendants acted willfully, or the Englert Defendants' actual profits with reasonable certainty.  The Englert Defendants do not propose an alternative amount of damages.

C.    Under the Lanham Act, while "a finding of actual damage [is] an important factor in determining whether an award of profits is appropriate,"[14] a plaintiff may recover the defendant's profits, absent a showing of actual damage, by establishing that the defendant's actions were willful.[15]

Here, a showing of willfulness is unnecessary as Plaintiff has shown actual damages as the result of the Englert Defendants' infringement.  Even though the Englert Defendants argue that Klein-Becker showed no damages, they agreed in their proposed

---

[14]*Western Diversified v. Hyundai Motor America*, 427 F.3d 1269, 1272 (10th Cir. 2005).

[15]*Id*. at 1273.

findings that Englert's sale of Klein-Becker's products "undermines the reputation and goodwill of the StriVectin-SD® brand," and that their sales "damage Plaintiff's relationships with authorized resellers, as well as their competitiveness in the cosmetics industry."[16] Thus, while the exact dollar amount of such damages cannot be ascertained due to the Englert Defendants' persistent and willful failure to cooperate in discovery and provide all information, as well as poor bookkeeping, the Englert Defendants have admitted that their infringement actually damaged Klein-Becker.

D.     Further, the record provides a basis for an award of profits even absent the showing of actual damages. Awarding profits involves a two-step process that requires the court to determine whether the defendant's actions were either willful or in bad faith, and then to weigh the equities so as to fashion a "remedy to meet the needs of [the] case."[17] The policy supporting an award of profits is to prevent the defendant's unjust enrichment, and to deter willful infringement.[18] The defendant's profits must be shown with "reasonable certainty."[19]

Before awarding profits, a court must determine whether the infringing party's acts were willful. In the Tenth Circuit, willfulness "requires an intent to appropriate the goodwill

_____

[16]Docket No. 317, Defendant's Proposed Findings, ¶ ¶ 17-18.

[17]*Western Diversified*, 427 F.3d at 1273.

[18]*Id*. at 1272.

[19]*First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1088 (D. Kan. 2000).

of another's mark."[20]  Circumstances of the infringement may give rise to an inference of intent to appropriate.  In *Western Diversified*, the court ruled that evidence showing that the infringing party had actually appropriated marks belonging to the trademark owner, that the infringer's marks were identical, and that the marks referred to substantially similar products aimed at the same group of consumers, gave rise to an inference of intent to appropriate.[21]  There, a car manufacturer began marketing its extended warranty under a name nearly identical to that of a warranty offered by an aftermarket warranty dealer.[22] Noting that an inference of intent could be rebutted, the court reversed the district court's grant of summary judgment to the car manufacturer and remanded the case to allow the manufacturer to rebut the presumption, ruling that the manufacturer's "deliberate adoption of . . . similar marks could lead to an inference that it intended to benefit from [the warranty dealer]'s goodwill."[23]

The circumstances of the infringement in the present case gives rise to an inference that the Englert Defendants intended to appropriate the goodwill of Klein-Becker's mark, and therefore acted willfully.  The Englert Defendants appropriation of Klein-Becker's mark is very similar to that of the car manufacturer in *Western Diversified*.  Because the Englert Defendants actually appropriated Klein-Becker's product, the appropriated marks were

---

[20]*Western Diversified*, 427 F.3d at 1270.

[21]*Id*. at 1277.

[22]*Id*. at 1271.

[23]*Id*. at 1277.

identical to Klein-Becker's.  Moreover, the Englert Defendants sales were aimed at those seeking to purchase Klein-Becker's actual products.  Patrick Englert had a copy of the reseller agreement and knew the actions of the Englert Defendants were prohibited. This creates an inference that the Englert Defendants acted with the intent to appropriate the goodwill of Klein-Becker's mark and, therefore, acted willfully within the terms of the Lanham Act.  The Englert Defendants put forward no evidence rebutting this presumption. Based on the entire record, including the findings of willfulness, the Court finds the Englert Defendants acted with the intent to appropriate the goodwill of the Klein-Becker's mark and that an award of profits to Klein-Becker is justified.

In addition to a finding of willfulness, a court must weigh the equities so as to fashion a remedy that meets the needs of the case.[24]  A court has "'wide discretion" when it weigh[s] the equitable considerations presented in [a] case," and an award of profits will not be set aside unless that discretion is abused.[25]

Equitable considerations that courts have weighed include whether the plaintiff lost any sales due to the infringement, whether the infringer benefitted from the goodwill associated with the plaintiff's trademark, and whether there was any consumer confusion or deception caused by the infringement.[26]  In *Bishop*, the estate of a dietary supplement producer sued a corporation for profits under the Lanham Act when it discovered the

---

[24]*Id*. at 1272.

[25]*Estate of Bishop v. Equinox Int'l. Corp*., 256 F.3d 1050, 1055 (10th Cir. 2001).

[26]*Id.*

corporation was using the same marketing slogan the supplement producer used for his product.[27]   The Tenth Circuit affirmed the district court's refusal to award profits, finding that the supplement producer did not lose any sales, that the corporation did not actually benefit from the goodwill associated with the producer's trademark, and that there was no actual consumer confusion or deception.[28]

In the present case, the equitable factors from *Bishop* support an award of profits to Klein-Becker.  Because the Englert Defendants actually obtained and resold Klein-Becker's product without authorization and the Englert Defendants' infringing activity likely caused Klein-Becker to lose sales.   While it is not certain that Klein-Becker would  have sold products to every one of the Englert Defendants' customers through Klein-Becker's authorized resellers, the infringement likely diverted some customers away from authorized resellers, causing Klein-Becker to lose sales.  Furthermore, the Englert Defendants' gross sales, at least $673,988.17 and perhaps much more, clearly show that the Englert Defendants benefitted from the goodwill associated with Klein-Becker's trademark.  Finally, the Englert Defendant's infringement likely deceived consumers into believing they were purchasing Klein-Becker's product from an authorized reseller. These factors establish that an award of profits to Klein-Becker is equitably appropriate.

---

[27]*Id*. at 1050.

[28]*Id*. at 1055.

In calculating profits, the plaintiff is "required to prove the defendant's gross sales only, [while the] defendant must prove all elements of cost or deduction claimed."[29]  "Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity. It then becomes the defendant's burden of showing . . . any permissible deductions."[30] While the amount of the defendant's sales must be established with "reasonable certainty,"[31] "courts may engage in some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing."[32]

In *Australian Gold*, a suntan lotion manufacturer sued a married couple that was reselling the manufacturer's products over the Internet without authorization. The couple appealed the jury verdict on grounds that the manufacturer did not present sufficient evidence of damages. However, in affirming the jury verdict, the Tenth Circuit reasoned that, even though there was "little evidence of the quantum of such damages in the record,"[33] there was still some evidence.   While some degree of speculation was

---

[29]15 U.S.C. § 1117(a).

[30]*First Savings*, 117 F. Supp. 2d at 1088.

[31]*Id.*

[32]*Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006) (internal citations and quotations omitted).

[33]*Id.* at 1241.

necessary, it was permissible, "particularly since the need for speculation [was] attributable in part to the Defendants' poor record keeping."[34]

Here, Klein-Becker has shown the Englert Defendants' gross sales through PayPal with certainty. Because the Englert Defendants admitted receiving payments in check, money order, and cash, that were in addition to the PayPal amount, the $673,988.17 figure for gross sales should be higher. But as found above, it is not possible to determine how much of the $400,186.69 represents the sales from check, money order, and cash, rather than through PayPal. Thus, the $673,988.17 certainly understates the gross sales.

As in the *Australian Gold* case, any speculation involved in estimating damages in this case is attributable to the Defendants' failure to submit evidence. For example, any amounts the Englert Defendants actually paid to Iowa Nutrition, an authorized reseller, is not known. After Klein-Becker put on evidence establishing the Englert Defendants' gross sales, the Englert Defendants made no effort to demonstrate any elements of cost or deduction claimed. As discussed above, the burden falls on the Englert Defendants to show any deduction and they failed to do so.[35] The Court finds that the Englert Defendants' gross sales were $673,988.17 and that, in the absence of any evidence to the contrary, those sales represent their profits. Accordingly, the Court awards $673,988.17 as damages under the Lanham Act.

---

[34]*Id*. at 1242 (citation omitted).

[35]15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed").

E.     Klein-Becker also seeks to multiply the damages under the Lanham Act.  That Act expressly grants the Court the discretion to "enter judgment . . . for any sum above the amount found as actual damages, not exceeding three times such amount."[36] Significantly, Klein-Becker seeks the remedy of multiplying damages only under 15 U.S.C. § 1117(a),[37] which provides:

> In assessing damages the court *may* enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Such sum in either of the above circumstances shall constitute compensation and not a penalty.*[38]

Under the circumstances of the present case, the Court finds that multiplying damages is not appropriate because the Lanham Act damages are already based on gross profits as actual damages could not be determined for the reasons stated above.

F.     The Court finds that Klein-Becker is entitled to its costs associated with this action.  The Lanham Act provides that a successful plaintiff is entitled to "the costs of the action."[39]   "[T]he prevailing party bears the burden of establishing the amount of costs to

---

[36]15 U.S.C. § 1117(a).

[37]Compare 15 U.S.C. § 1117(b) (requiring treble damages in some circumstances).

[38]15 U.S.C. § 1117(a) (emphasis added).

[39]*Id.*

which it is entitled."[40]  These requests must be reasonable.[41]  Once the prevailing party has established this, the non-prevailing party then carries the burden to dispute this amount.[42]  Moreover, "the district court possesses 'broad discretion' in awarding costs."[43]  The Court will award fees and costs.  Klein-Becker has stated that it will submit and affidavit of fees and costs.

Attorney fees are likewise awardable under the Lanham Act in exceptional cases.[44]  Attorney fees will be considered below.

5.    COPYRIGHT INFRINGEMENT DAMAGES

A.    The Englert Defendants infringed Klein-Becker's registered federal copyright in the packaging for the StriVectin product (Registration No. VA 1-324-409).  The Court finds that the Englert Defendants' copyright infringement was willful.

B.    Pursuant to 17 U.S.C. § 504, when suing for copyright infringement, a successful plaintiff may elect to recover actual damages and any additional profits from the infringer, or statutory damages.[45]  Statutory damages range from $750 to $30,000 for each

---

[40]*In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, 1148 (10th Cir. 2009).

[41]*Id.*

[42]*Id.*

[43]*Id.* (citing *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1245 (10th Cir. 1988)).

[44]15 U.S.C. § 1117(a).

[45]17 U.S.C. § 504(a) (2006).

work infringed.[46]  This amount may be adjusted up to $150,000 if the plaintiff, carrying the burden, proves the infringement was willful, but may also be reduced to $200 if the defendant proves it was not willful.[47]  However, Congress has indicated that, "as a general rule, where the plaintiff elects to recover statutory damages, the court is obliged to award between $250 and $10,000" unless the plaintiff proves that infringement was willful.[48] The underlying policy, the Supreme Court has noted, is "not merely [to compel] restitution of profit or reparation for injury but also . . . to discourage wrongful conduct."[49]

Here, Klein-Becker has elected statutory damages and requests $30,000.  The Englert Defendants argue that the minimum statutory award of $750 is appropriate.

C.    Because the copyright infringement damages are based on the same sales as the Lanham Act damages, the Court must consider whether an award under both the Lanham Act and the Copyright Act would be a double recovery.

Courts are split over whether awarding damages under both the Lanham Act and the Copyright Act for the same act constitutes an impermissible double recovery.[50]  Some do permit an award of statutory damages under the Copyright Act in addition to actual damages under the Lanham Act. Other circuits are split internally as to whether such

---

[46]*Id.* at § 504(c)(1).

[47]*Id.* at § 504(c)(2).

[48]H.R. Rep. No. 94-1476.

[49]*F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

[50]*Lifted Research Group v. Behdad*, 591 F. Supp. 2d 3, 9 (D. D.C. 2008).

double recovery is impermissible.[51]  A central concern is allowing the plaintiff to receive a windfall.

Courts that have allowed a plaintiff to recover profits under the Lanham Act and statutory damages under the Copyright Act have justified doing so by reasoning that each award serves a different purpose. As reasoned in *Lyons*, any measure of damages awarded under the Lanham Act "constitute 'compensation only and not a penalty,'" while statutory damages under the Copyright Act "have a somewhat different and broader focus. Indeed, they may be awarded . . . for purposes other than compensation, including both deterrence and punishment."[52]

While the Tenth Circuit has yet to rule on this specific issue, its past rulings have disallowed double recovery when two claims arise from the same operative facts and seek identical relief.[53]  In other words, a plaintiff likely will not be allowed multiple punitive damages awards if the defendant committed just one act.[54]  Whether damage awards are duplicative is a question of fact.[55]

---

[51]*See Nintendo of Am. v. Dragon Pac. Intern*., 40 F.3d 1007, 1011 (9th Cir. 1994) (reasoning that although selling plaintiff's product was one act, it constituted two separate wrongs); *Microsoft Corp. v. Tierra Computer*, 184 F. Supp. 2d 1329 (N.D. Ga. 2001).

[52]*Lyons P'ship, L.P. v. AAA Entm't Inc.*, 1999 WL 1095608 (S.D. N.Y. Dec. 3, 1999).

[53]*Mason v. Okla. Turnpike Auth*., 115 F.3d 1442, 1459 (10th Cir. 1997).

[54]*See id.*

[55]*Id.*

In the current case, the Englert Defendants' violations of both the Lanham Act and the Copyright Act stem from the same operative facts: their unauthorized sale of Klein-Becker's product. However, although the Tenth Circuit has reasoned that an award of defendant's profits does serve to deter willful infringement[56], the Lanham Act clearly states that an award of profits "shall constitute compensation only and not penalty."[57]  Therefore, Klein-Becker should be fully compensated for its loss stemming from the Englert Defendants' unauthorized sale of Klein-Becker's product by an award of their profits in connection with the Lanham Act damages.  Any additional awards that are compensatory in nature would likely result in a windfall to Klein-Becker.

The Supreme Court has noted that statutory damages under the Copyright Act also serve a deterrent purpose.[58]  This, coupled with the provision in the statute allowing the judge to increase the amount of statutory damages upon a showing of the infringer's willfulness, suggests that statutory damages could be reasonably classified as punitive. Because of the deterrent nature of statutory damages under the Copyright Act, coupled with the compensatory nature of a profits award under the Lanham Act, awarding both measures of damages is not an impermissible double recovery, even though the violations stem from the same operative facts.

---

[56]*Bishop*, 256 F.3d at 1055.

[57]15 U.S.C. § 1117(a).

[58]*Woolworth*, 344 U.S. at 233.

In determining the amount of the appropriate statutory damages award under the Copyright Act, a court considers the same factors as an award of statutory damages under the Lanham Act.[59]  Those factors are:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [copyright]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.[60]

Because Klein-Becker has already been compensated for its damages from the sales of StriVectin products, only factors four, five, and seven are relevant to imposition of a statutory amount under the Copyright Act to impress upon the Englert Defendants the consequences of their willful copyright violations and serve to deter the Englert Defendants as well as others who contemplate copyright violations in a similar manner.  Based on the above factors, the Court finds that an award of $10,000 for the copyright violation is necessary to maximize the award's deterrent value.  Any lesser amount would be too easily absorbed as a cost of doing business by intentional violation of a copyright.   Accordingly, the Court awards $10,000 as copyright damages.

6.     FRAUD DAMAGES

---

[59] *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) (in copyright case, directing that courts should consider the factors listed above in awarding statutory damages for willful copyright infringement).

[60] *Id*. at 1117.

A.    Klein-Becker is entitled to recover the amount of its actual damages from the Englert Defendants for their participation in the GNC fraud scheme.  In Utah, "courts will allow recovery for lost profits or other related consequential damages in a fraud action, provided that such damages can be proven with reasonable certainty and are a reasonably foreseeable consequence of the defendant's act."[61]

The proper measure for compensatory damages in a fraud action is the difference between the value of the exchange as represented and the value of the exchange had it been properly represented.[62]  In *Watkins & Faber v. Whiteley*, the Utah Supreme Court approved of an Oregon court's award of damages to a financial institution who had taken interest in property that it later discovered was overvalued.[63]  It brought suit against a real estate owner who, the Oregon court found, had fraudulently represented the value of the property.[64] The court awarded damages to the financial institution in the amount of the difference between the value of the property as represented and the fair market value of the property.[65]

In this case, Klein-Becker should likewise be awarded the difference between the value of the exchange as made according to the Englert Defendants' representations and

---

[61] *Ong Inter. (USA) Inc. v. 11th Ave Corp.*, 850 P.2d 447, 457 (Utah 1993).

[62] *Watkins & Faber v. Whitely*, 578 P.2d 514 (Utah 1978).

[63] *Id.*

[64] *Id.*

[65] *Id.*

the fair market value of the exchange. The amount of damages can be proven with reasonable certainty, as records exist of the amount of product the Englert Defendants purchased as a result of the scheme.[66]  Moreover, the Englert Defendants should have reasonably foreseen that this scheme, which allowed the Englert Defendants to purchase Klein-Becker's product at a discounted price, would cause Klein-Becker to lose money. Through this scheme, the Englert Defendants purchased 1,186 units by fraudulently representing the company as a GNC store, at a discounted price of approximately $82,050. The price that the Englert Defendants should have paid had they properly represented their true identity is the retail value of Klein-Becker's product.  Based on these numbers, the total amount of compensatory damages Klein-Becker should be awarded is $78,060.

The Englert Defendants contend that the value Klein-Becker should have received is the wholesale value per unit, rather than the retail value.  However, the retail value, not the wholesale value, more accurately reflects the fair market value of the exchange because it is the price the Englert Defendants would have paid absent the scheme. Because of this, the amount of fraud damages should be calculated using the retail value as set forth above in the amount of $78,056.14.

---

[66]*See* Defendant's Proposed Findings, ¶ 34.

7.      DAMAGES UNDER THE UTAH TRUTH IN ADVERTISING ACT AND  UTAH
        UNFAIR PRACTICES ACT

A.      Utah Code Ann. § 13-11a-4(2)(b) allows the successful plaintiff in an action
for violation of the Utah Truth in Advertising Act (UTAA) to recover three times actual
damages or to elect statutory damages of $2,000, which ever is greater.  Klein-Becker has
elected statutory damages.

B.      Utah Code Ann. § 13-5-14 allows the plaintiff in an action for violation of the
Utah Unfair Practices Act (UUPA) to recover three times actual damages or elect statutory
damages of $2,000.  Klein-Becker here has elected statutory damages.

C.      Although the UTAA and UUPA each normally entitle a successful plaintiff to
$2,000 in statutory damages,[67] the Tenth Circuit has ruled that "if a state claim and a
federal claim rise from the same operative facts, and seek identical relief, an award of
damages under both theories would constitute double recovery."[68]

As stated previously, whether relief is identical depends on whether it is classified
as compensatory or punitive.  In *U.S. Industries*, the Tenth Circuit affirmed the trial court's
reduction of damages upon a finding that the award would have been duplicative.[69]  The
plaintiff sued under the 1933 and 1934 Securities Acts, as well as under multiple state law

---

[67]Utah Code Ann. § 13-11a-4 (2010); Utah Code Ann. §13-5-14 (2010).

[68]*U.S. Industries*, 854 F.2d at 1259.

[69]*Id.* at 1260*.*

causes of action, including breach of fiduciary duty.[70]  The court ruled that each claim "occurred in the same transaction."[71]  And while the two measures of damages were not identical, the court nonetheless ruled that a reduction in damages was not clearly erroneous.[72]

Here, like the plaintiff in *U.S. Industries*, Klein-Becker's claim to statutory damages under the UTAA and UUPA arise out of the same transaction—the Englert Defendants' unauthorized sale of Klein-Becker's product—as its federal claims.

The UTAA and the UUPA, like the Copyright Act, deterrent purposes.[73]  Because damages under state law and federal law are identical and arise out of the same transaction, and because of the deterrent effect of the copyright damages, the Court finds that on the specific facts of this case, Klein-Becker should not be allowed to recover statutory damages under the UTAA or UUPA in addition to those already awarded under the Copyright Act.  The Court is not holding that such statutory awards under all three Act are not available in a single case, only that they should be awarded in the present case.

---

[70] *Id.* at 1223.

[71] *Id.* at 1260.

[72] *Id.*

[73] *See e.g.* Utah Code Ann. §§13-11a-1 (providing that purpose of the UTAA is to "prevent deceptive, misleading, and false advertising practices and forms in Utah").

8.    ATTORNEY'S FEES

A.    Under the Lanham Act "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party."[74]

B.    In the Tenth Circuit, an exceptional case is one in which the "trademark infringement is malicious, fraudulent, deliberate, or willful."[75]

C.    Because the Court has concluded that the Englert Defendants infringement in this case was willful, and because of the Englert Defendants' conduct in the course of this case as outlined in the Magistrate Judge's Orders, the Court finds that it is an exceptional case within the meaning of 15 U.S.C. § 1117(a). The Englert Defendants' business model itself is based on violations of Klein-Becker's trademark and copyright rights. Further, because the Englert Defendants have been found liable for fraud, Klein-Becker would also be entitled to recover its reasonable attorney's fees incurred in this matter based on the fraud. Finally, attorney fees are also awardable under the UTAA.[76]

Accordingly, the Court awards Klein-Becker its attorney fees under the Lanham Act. The Court need not award attorney fees on the other causes of action because it would be duplicative of the fees already awarded under the Lanham Act.

---

[74]15 U.S.C. § 1117(a).

[75]*United Phosphorous, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1232 (10th Cir. 2000).

[76]Utah Code Ann. § 13-11a-4(2)(c) (providing that the Court "shall award attorneys' fees to the prevailing party").

9.	PUNITIVE DAMAGES

A.	The Englert Defendants have been found liable for intentional torts and statutory causes of action that allow for the recovery of punitive damages, including Klein-Becker' claims for fraud.

B.	However, the Court finds that the circumstances of this case do not warrant the imposition of punitive damages against the Englert Defendants.  It is true that the Englert Defendants have repeatedly ignored and disregarded their obligations under the Rules of Civil Procedure and even direct orders of this Court.  Moreover, they have been found liable for tortious and other intentional acts in violation of Klein-Becker' trademark rights and other business interests.  However, the Englert Defendants have already been sanctioned for their failure to comply with their duties as litigants in this Court including the violations of past orders.  The Court has found, above, that further sanctions for the failure to timely pay anything on the Court ordered sanction are not warranted at this time. Further, the Court has already imposed statutory damages to deter further violations of the Copyright Act and has found that multiplying damages is not appropriate in this case under the Lanham Act.  Finally, the Court has already imposed attorney fees under the Lanham Act because this is an exceptional case.   Based on the entire record, the Court finds that punitive damages should not be imposed.

10.    PERMANENT INJUNCTION

A.    The Englert Defendants have been found liable on a number of different claims for which the law allows or requires the Court to enter a permanent injunction.[77]

B.    "Pursuant to the Lanham Act, the district court has the 'power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent . . . a violation [of the Act].'"[78]   The Court finds that Klein-Becker is entitled to a permanent injunction.   Klein-Becker has succeeded on the merits. As discussed above, the Englert Defendants' business model is based on violations of Klein-Becker's trademark rights.   The balance of injury tips in favor of Klein-Becker.   The Englert Defendants have no legitimate interest to be protected in their actions which have been found to be violation of the Lanham Act, in violation of the UTAA and the UUPA, and/or actually fraudulent.   The public's interest is not implicated by the contemplated permanent injunction.

In addition, "[f]or a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."[79]   A district

---

[77]*See, e.g.,* 15 U.S.C. § 1116(a); Utah Code Ann. § 13-11a-4(2)(a); Utah Code Ann. § 13-5-14.

[78]*John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1142 (10th Cir. 2008) (quoting 15 U.S.C. § 1116(a)).

[79]*Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir.

court may find irreparable harm "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer."[80]

Without a permanent injunction barring them from using Klein-Becker's marks and offering to sell, advertising, distributing, or marketing Klein-Becker's StriVectin products, Klein-Becker's interest in its marks will continue to be harmed. As discussed above, based on the Englert Defendants' misconduct in this case, it is likely that actual damages will continue to be difficult to prove.

Based on the evidence at trial and the entire record in this case, the Court finds that Klein-Becker has shown all of the elements necessary to be entitled to a permanent injunction. The Court hereby concludes that a permanent injunction is appropriate and necessary to prevent future violations of the law by the Englert Defendants.

C. Klein-Becker requests that the Preliminary Injunction issued herein be made permanent. However, that Preliminary Injunction remains sealed on Klein-Becker's Motion[81] and there may have been some changes in the parties' circumstances since the issuance of the preliminary injunction. Plaintiff shall submit a proposed form of the Permanent Injunction within ten days of the entry of these findings and conclusions.

---

2007)).

[80]*Id*. (quoting *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (quotation and alterations omitted).

[81]Sealed Docket No. 157.

11.     PREVIOUSLY AWARDED SANCTIONS

A.      On January 22, 2008, Magistrate Nuffer ordered the Englert Defendants to "pay the sum of $75,411.45 to Plaintiff" to compensate Klein-Becker for the fees and expenses incurred in prosecuting their Motion for Sanctions and Renewed Motion for Sanctions, and to do so no later than February 29, 2008.

B.      To date, the Englert Defendants have not paid the amount ordered.  At trial, Klein-Becker sought additional contempt sanctions for the failure to pay the required sanction.  The Court finds that the Englert Defendants have failed to pay even a token amount on the sanctions.   As the post-trial submissions show, the Englert Defendants have still failed to pay anything on the contempt sanction.

However, in light of the fact that there was evidence that Patrick Englert had attempted to contact Klein-Becker's former counsel about trying to work out a payment plan and that current counsel was unaware of what those discussions might have been, the Court finds further sanctions are not appropriate.

C.      The judgment against Defendants shall also include the $75,411.45 previously awarded.

12.  CONCLUSION

Based on the foregoing, it is

ORDERED that judgment shall be entered in favor of Plaintiffs and against Defendants Patrick Englert and  Mr. Finest Supplements, Inc. on all claims.  Judgment shall enter in favor of Plaintiffs and against said defendants in the amount of $673,988.17

for Lanham Act damages, $78,056.14 for fraud damages, $11,340 for stolen property, and $10,000 for copyright damages, for a total of $ 773,384.31.  It is further

ORDERED that judgment shall be entered in favor of Plaintiff and against Defendants on Defendants' claim against the preliminary injunction bond for any product seized by or purchased from Klein-Becker.  It is further

ORDERED that  the Court awards attorney fees and costs under the Lanham Act up through entry of this judgment.  Plaintiff shall file its Bill of Costs and itemization of attorney fees in accordance with the applicable rules.  It is further

ORDERED that a permanent injunction will issue. Plaintiff's counsel shall submit a proposed form of the permanent injunction in accordance with the local rules.

DATED   January 18, 2011.

BY THE COURT:

_____
TED STEWART
United States District Judge